Elizabeth G. **MILLER**, Plaintiff,

v.

**BENEFICIAL MANAGEMENT CORPORATION**, Beneficial Management Corporation of America and Beneficial Corporation, Defendants.

Civ. A. No. 89–3089 (AJL).

United States District Court,
D. New Jersey.

Oct. 18, 1991.

Aron M. Schwartz, Vogel, Chait, Schwartz and Collins, Morristown, N.J., for plaintiff.

S. Joseph Fortunato, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for defendants.

## OPINION

LECHNER, District Judge.

This is an employment discrimination suit brought by plaintiff Elizabeth G. Miller ("Miller") against defendants Beneficial Management Corporation ("Beneficial Management"), Beneficial Management Corporation of America ("Beneficial of America") and Beneficial Corporation. ("Beneficial Corp.") (collectively, "Beneficial"). Jurisdiction is alleged pursuant to the Equal Pay Act, as amended, 29 U.S.C. § 216 *et seq.* ("EPA"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, *et seq.* ("ADEA"); Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII") and 28 U.S.C. § 1331.

Beneficial now moves for dismissal pursuant to Fed.R.Civ.P. 12(b) on the ground that Miller's claims are barred by the applicable statute of limitations. In addition, Beneficial moves for summary judgment pursuant to Fed.R.Civ.P. 56 on the ground there is no genuine issue of material fact regarding the alleged discrimination against Miller.[1] Miller has filed a cross

---

1. In support of its motion, Beneficial has submitted the following: Defendants' Notice of Motion for Dismissal and/or Summary Judgment; Memorandum in Support of Motion to Dismiss and/or for Summary Judgment ("Moving Brief"); Defendants' Statement of Material

motion appealing three orders of Ronald J. Hedges, United States Magistrate Judge, to compel discovery.[2] For the reasons set out below, the 12(b)(6) motion to dismiss is converted to a Rule 56 motion for summary judgment. The motion for summary judgment is granted. The cross-motion to compel discovery is denied.

*Facts*

Beneficial is incorporated in the State of Delaware and has its principal place of business in Peapack, New Jersey. Complaint, filed 20 July 1989 ("Complaint"), ¶ 2. Beneficial is in the business of providing management services. The Government Relations Department ("Government Relations") is involved in lobbying, organizing political action committees ("PACs") and collecting political contributions. *Id.*, ¶ 3; Moving Brief, 6.

Miller graduated from law school in the Spring of 1980. Defs.' 12G Statement, ¶ 2. Prior to attending law school, Miller was employed as a teacher. *Id.* Miller's first job as an attorney occurred when she was hired by Beneficial Management on 2 September 1980. Defs.' 12G Statement, ¶ 2.

Miller's resume indicated she was born in 1931; however, Miller was actually born in 1927 or 1928. 1st Ward Aff., Ex. 14. Miller held the starting position of Associate Counsel in the Legal Department of Beneficial. *Id.* As Associate Counsel, Miller's starting annual base salary was $25,000. Miller Aff., ¶ 1.

Miller's duties in the Legal Department included the following:

> cross state lending; Canadian operations; bankruptcy; antitrust; loan production offices for Beneficial's national bank subsidiary; Equal Credit Opportunity Act audits; Truth-in-Lending audits; writing statutory amendments concerning state and federal insolvency and bankruptcy laws for the Government Relations Department; usury laws; disclosure laws; credit insurance laws; business registration laws; consumer credit laws; interest rate regulation; small loan laws; installment sales laws; and fair credit laws.

Miller Aff., ¶ 2. During Miller's employment in the Legal Department she received the following compensation:

| Year | Base Salary | Year–End Compensation |
|------|-------------|-----------------------|
| 1980 | $25,000 | $1,000 |
| 1981 | $27,000 | $2,000 |
| 1982 | $29,000 | $3,000 |
| 1983 | $31,000 | $3,000 |

---

Facts Not in Dispute ("Defs.' 12G Statement"); Affidavit of Charles E. Hance, Esq. ("Hance Aff."); Affidavit of David B. Ward, Esq. ("1st Ward Aff."); Supplemental Affidavit of David B. Ward, Esq. ("2d Ward Aff."); Affidavit of Jan E. LeRoux, Esq. ("LeRoux Aff."); Defendants' Reply Brief in Support of Motion ("Reply Brief").

In opposition to the motion, Miller has submitted the following: Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Opp. Brief"); Plaintiff's Statement Regarding Material Facts Pursuant to Local Rule 12G ("Miller 12G Statement"); Affidavit of Elizabeth Miller ("Miller Aff."); Certification of Aron M. Schwartz ("Schwartz Certif."); Transcript of Deposition of Charles Walsh, dated 9 July 1990 ("1st Walsh Dep."); Transcript of Deposition of Charles Walsh, dated 10 July 1990 ("2d Walsh Dep."); Defendants' Responses to *Requests for Admissions*; and Transcript of Deposition of Helen Perry Reilly.

At the commencement of oral argument, the court indicated it was inclined to grant the Beneficial motion. Thereafter, on 26 September 1991, after oral argument was heard, Miller submitted a request to submit a supplemental affidavit. Miller had three months to prepare opposition. The moving brief is dated 11 March 1991 and the motion packet was not filed until 7 August 1991 pursuant to N.J.Fed.Prac.R. 12, App. 2. Therefore, the request to submit a supplemental affidavit was denied. See letter, dated 30 September 1991, from the court to counsel to Miller.

**2.** In support of its cross-motion, Miller has submitted the following: Notice of Cross–Motion; Plaintiff's Letter Brief in support of Cross–Motion to Compel Discovery ("Pl's Ltr. Brief") and Plaintiff's Reply Letter Brief in support of Cross–Motion ("Reply Ltr. Brief").

In opposition to the cross-motion, Beneficial has submitted the following: Defendants' Letter Brief in Opposition to Cross–Motion ("Defs.' Ltr. Opp.").

*Id.*, ¶ 4. The above increases in annual base salary and additional year-end compensation were based on merit. *Id.;* Schwartz Certif., Ex. 11.

In the Legal Department, Miller reported to Charles Hance, Esq., Senior Vice President and General Counsel, Legal Department ("Hance"). Hance Aff., ¶ 2. In 1983 Hance prepared a formal review of Miller's performance in the Legal Department (the "1983 Bentrak"). *Id.*, ¶ 4. Miller was ranked eighth out of eight attorneys who reported to Hance. *Id.*, ¶ 3. The 1983 Bentrak gave Miller good remarks with respect to her organizational and planning skills, motivation, initiative and energy. *Id.*, Ex. 2. The 1983 Bentrak, however, rated Miller's overall performance as below expectations. It noted a difficulty in providing practical advice satisfactory to senior personnel. Additionally, the 1983 Bentrak stated Miller's personal impact must be improved to be effective in her position. *Id.*

As an Associate Counsel in the Legal Department Miller became acquainted with David B. Ward, Senior–Vice President of Government Relations ("Ward"), Charles Walsh, Vice President and Counsel of Government Relations ("Walsh") and Kenneth Raatz, a corporate attorney in Government Relations ("Raatz"). Miller Aff., ¶ 6. Through her contact with these individuals, Miller learned about the function of Government Relations.

Government Relations develops and presents Beneficial's views relating to legislative and regulatory groups at the federal and state levels. Moving Brief, 6. In addition, Government Relations handles PACs and corporate sources. Ward Aff., ¶ 3. Employees in Government Relations must ensure the appropriate disclosure and filing requirements are followed with respect to lobbying and political contributions. *Id.*, ¶ 4.

Walsh was hired by Beneficial on 30 October 1966. 1st Walsh Dep., 7. Walsh

graduated law school in 1954 at which point he worked at a Philadelphia law firm for two years. *Id.*, 4–5. In 1956 Walsh joined the Attorney General's Office in Pennsylvania as an associate counsel for the Insurance Commission. *Id.*, 5. At the Attorney General's Office, Walsh was promoted to general counsel and subsequently deputy insurance commissioner for Pennsylvania. *Id.* Walsh's duties at the Attorney General's Office included reviewing proposed legislation which had an impact on insurance laws or industry, advising the governor's office and leaders of both political parties of the Attorney General's position on such legislation and conducting and adjudicating hearings involving the insurance industry. *Id.*

In 1963, Walsh left the Attorney General's Office and became the executive vice president of Reliable Insurance Company where he reported directly to the Chairman of the Board of Reliable Insurance Company. *Id.*, 6. Around 1 May 1966, Walsh became deputy insurance commissioner for the Commonwealth of Kentucky. *Id.*, 7. As deputy insurance commissioner in Kentucky, Walsh was involved in setting rates, policy filings and endorsements as well as conducting hearings and advising the insurance commissioner. *Id.* Walsh held the position as deputy insurance commissioner until 30 October 1966 when he accepted employment with Beneficial. *Id.*

Walsh began his employment at Beneficial as Director of Insurance Relations. *Id.* In that position, Walsh reviewed legislation and insurance offered by Beneficial and testified at hearings on legislation at the federal and state level. *Id.* In 1968 Walsh was promoted to Assistant Vice President, Beneficial Management.[3] *Id.*, 8. In 1973 Walsh was asked to join the Legal Department of Beneficial Management as Assistant Vice President, Associate Counsel. *Id.*, 10. Walsh also represented Beneficial in various trade associations and became the

---

3. Walsh testified that this promotion was primarily in title and he did not assume any addi-

tional duties as assistant vice president. 1st Walsh Dep., 8–9.

Chairman of the Board of the Consumer Credit Insurance Association.[4] *Id.*, 9.

In the Legal Department, Walsh reported directly to Helmuth Miller, who was at that time the Vice President of Government Relations.[5] *Id.*, 10. In 1976 or 1977 Walsh was promoted to Vice President of Government Relations. *Id.* In this position, Walsh advised Helmuth Miller, consulted with other employees of the Government Relations on areas concerning legislation, reviewed laws relating to PACs, set up the Beneficial Political Action Committee ("Ben–Pac"), made decisions as to who should receive contributions from Ben–Pac and reviewed material disseminated by Beneficial for legal compliance. *Id.*, 10–12.

In 1975 Raatz was hired as Associate Counsel in the Legal Department. Raatz was assigned to work for Helmuth Miller and Walsh in Government Relations where he assisted Walsh with the review of legislation. *Id.*, 18.

In 1979 or 1980 Helmuth Miller retired and was replaced by Ward. *Id.*, 17. Ward assumed Helmuth Miller's responsibilities as Senior Vice President. Ward did, however, become more involved and took over tasks that Helmuth Miller had allowed Walsh to handle. *Id.*, 25. In addition, after Ward took over, Walsh had less contact with the Chairman of the Board. *Id.*, 28. Walsh testified he had "less authority and independence" under Ward. *Id.*, 29. As Walsh stated, by the time he left Beneficial "men who had been with the company for a period of time became more familiar with Mr. Ward and would call him on matters that they previously might have called me on." *Id.*, 31.

Throughout Walsh's employment in Government Relations with Ward as his supervisor, his duties can be paraphrased to include the following: as secretary of Ben–Pac, preparing the forms necessary for contributions, filing reports required by the Federal Election Commission on a monthly or quarterly basis, preparing, for signature of the Chairman of the Board, letters to those employees eligible to participate in Ben–Pac, preparing and disseminating detailed itemizations of contributions, requisitioning checks signed by the Ben–Pac treasurer and determining who would receive contributions and the amounts of the contributions; with respect to corporate contributions, reviewing state laws to determine the legality of corporate contributions—to whom corporate contributions may be made, the dollar limitations of corporate contributions and deciding with Ward what contributions would be made at the recommendation of the Government Relations field director in the particular state; with respect to the expense accounts of the Government Relations directors, reviewing the expense accounts to make sure the expenses complied with any legal requirements and to ascertain whether there were any outstanding expenditures; preparing and filing reports and disclosures by lobbyists; reviewing proposals for political candidates or political fund raising purposes before such functions were held; receiving copies of any proposed legislation and advising Government Relations field directors of legislative developments; planning and organizing political fund raisers held at Beneficial's corporate headquarters, organizing the annual Government Relations conference; approving and establishing retainers paid by Beneficial to attorneys; and providing lectures and training of district managers throughout the year. *See generally,* 2d Walsh Dep.

Walsh's income during his employment in Government Relations was as follows:

---

**4.** All of the positions with trade associations were advantageous because the trade associations related to Beneficial's insurance business. 1st Walsh Dep., 9.

**5.** Prior to 1980, Government Relations was called the department of public relations. For purposes of clarity, the department will be referred to only as Government Relations.

Helmuth Miller was later promoted to Senior Vice President of Government Relations. His duties were primarily the same as Walsh's, however, Helmuth Miller sat on the Management Committee of Beneficial Management.

| Year | Base Salary | Year–End Additional Compensation[6] |
|------|-------------|-------------------------------------|
| 1977 | $41,000 | $14,000 |
| 1978 | $43,000 | $16,000 |
| 1979 | $46,000 | $18,000 |
| 1980 | $49,000 | $20,500 |
| 1981 | $52,000 | $23,000 |
| 1982 | $53,000 | $27,000 |
| 1983 | $55,000 | $28,500 |
| 1984 | $55,000 | $28,500 |

LeRoux Aff., Ex. 6.

In early 1984 Ward informed Miller that Walsh's and Raatz' employment in Government Relations was going to be terminated. Miller Aff., ¶ 7. At that time, Ward decided to consolidate the positions previously held by Walsh and Raatz into one position. Schwartz Certif., Ex. 1. Ward asked Miller if she wanted to fill the newly created position in Government Relations. Miller Aff., ¶ 7. Miller states that Ward told her "once [she] had settled in the job, with hard work [she] would become a Vice President . . . and would receive compensation at a level equivalent to Walsh's." *Id.* A memorandum from Ward to David J. Farris ("Farris"), President of Beneficial Management, dated 14 March 1984, informed Ward of his decision to hire Miller for the new position.[7]

Schwartz Certif., Ex. 1.

Prior to formally beginning in Government Relations, Miller met with Walsh on several occasions. 1st Walsh Dep., 44–45. During these meetings, Walsh reviewed with Miller the various tasks which he had done in Government Relations. *Id.*, 45; Miller Aff., ¶ 9. Walsh could not recall whether he met with Miller at the instruc-

tion of Ward. Walsh testified he mentioned training Miller to Ward, but Ward never told Walsh to go ahead and train her. 1st Walsh Aff., 44. Miller testified she met with Walsh at the specific instruction of Ward. Miller Aff., ¶ 9. Miller also met with Raatz to learn about his responsibilities in Government Relations. *Id.*, ¶ 10; 1st Walsh Dep., 47. Miller stated during the entire training process she was never informed, nor was it implied, that she would not take on all of Walsh's responsibilities. Miller Aff., ¶ 12.

In May 1984 Miller was appointed to certain offices and positions previously held by Walsh which were necessary for the job. *Id.*, ¶ 14. Miller was appointed as Secretary, member of the Finance Committee and member of the Board of Ben–Pac and Vice President of Beneficial Management.[8] *Id.* In July 1984 Miller formally began her position as Associate Counsel in Government Relations. *Id.*, ¶ 6. Miller received a $9,000 increase in salary raising her annual base salary to $40,000. When Miller began her position in Government Relations, she had four years of legal expe-

---

6. Year-end compensation increases at Beneficial were based on merit. Schwartz Certif., Ex. 11.

7. The memorandum provided in pertinent part:

Mrs. Miller brings with her an excellent academic background and four years of experience with us. After some earlier concerns, Mr. Hance has indicated that her performance has improved greatly. I have worked with her . . . and am thoroughly convinced of her capabilities and of her potential in the Government Relations Department.

. . . I have reviewed about 100 resumes and I believe that *to find* an outside replacement of equivalent background and experience would cost at least $10,000 more and probably double that. Also, there would be a substantial learning period involved with any outside attorney regardless of experience.

Schwartz Certif., Ex. 1 (emphasis added).

8. The appointment as Vice President of Beneficial Management was purely a status position and did not carry with it any employment significance. Miller Aff., n. 3.

rience; at the time Walsh had received an annual base salary of $41,000 and began in Government Relations, he had twenty-two years of legal experience.[9] *Id.* Miller was a grade 15 employee when she took over the position in Government Relations. 2d Ward Aff., ¶ 3. Miller moved into Walsh's office and two secretaries were assigned to her.[10] *Id.,* ¶ 15. Miller stated she was involved with all of Walsh's duties from the onset of her employment in Government Relations. *Id.,* ¶ 16. Miller concedes she initially had disagreements with Ward over the practices of Government Relations. *Id.,* ¶ 18.

Miller received a $5,000 additional year-end compensation bonus for her performance in 1984. *Id.,* ¶ 17. In addition, Miller received a pay increase in her annual base salary in the amount of $3,000 in Government Relations in January 1985. *Id.,* ¶ 17.

In June 1985 Miller was promoted to Assistant Vice President and became a grade 16 employee. *Id.,* ¶ 18; Schwartz Certif., Ex. 3. Miller received a copy of a memorandum from Ward to memorialize the promotion which stated:

9. Miller's legal experience dates from the time she graduated law school in 1980 and includes her work at Beneficial. Ward's legal experience dates from the time he graduated law school in 1984 and includes his experience obtained while working at a law firm, various state insurance agencies, an insurance company and Beneficial.

10. Miller was given Walsh's secretary and was allowed to hire a secretary to replace Raatz' secretary. Miller Aff., ¶ 15.

11. The letter from Farris stated:
Sincere congratulations on the occasion of your promotion to Assistant Vice President.

This is a well-deserved and well-earned promotion and I wish you much success as you take on your additional responsibilities.
Miller Aff., Ex. 5.

12. The 1985 JAQ summarized Miller's duties as Assistant Vice President as follows:
Responsible for advising members of the Government Relations Department and personnel in all parts of the Beneficial System as to proposed, spending, and new, regulations and legislation. Interact with Government Relations Directors, legal department attorneys, insurance attorneys and personnel, tax attorneys and personnel, Wilmington attorneys and Washington staff in order to famil-

Mr. Caspersen [ ("Caspersen"), Chairman and CEO of Beneficial Corporation,] has reviewed and approved my recommendation for promotion of Elizabeth G. Miller to Assistant Vice President effective June 15, 1985.
This will carry with it a promotional increase of 10% of current salary or $4,300, for annual [base] rate of $47,300.

*Id., Ex. 4.* At the time Miller received this increase, she had five years of legal experience; Walsh had twenty-four years of legal experience when he had an annual base salary of $46,000 and twenty-five years of legal experience when his base salary was $49,000. Miller states Ward also informed her that he was pleased with her work. *Id.,* ¶ 18. Miller also received a letter from Farris congratulating her on the promotion.[11] *Id.,* ¶ 19.

In connection with Miller's promotion, she was requested to complete a Job Analysis Questionnaire ("JAQ"). *Id.,* ¶ 20. The completed JAQ contained a comprehensive description of the duties and responsibilities performed by Miller as of July 1985 ("1985 JAQ").[12] *Id.,* ¶ 20, Ex. 6. Miller

iarize them with issues, discuss those issues and add this imput to my ultimate legal analysis. Also consult with outside personnel within the industry; Attorneys; Legislators, Regulators, etc. Help directly in the legislative process by taking part in the supervision of the Government Relations Directors by providing them with legal analyses and advice as to amendments, etc. Responsible for making sure that the corporation is in compliance with all laws pertaining to political facilities for political fundraisers, and all the many necessary disclosures of the above. Help problem solve through the legislative, administrative, regulatory process or through new procedures. Make certain that any legislation or change in procedure is communicated immediately to the proper corporate personnel so that proper procedures can be instituted within the legislated time periods. Represent the corporation as an attorney and corporate representative with various regulators, administrators, legislators, organizations, and committees. Help with the overall planning process for the corporation by maintaining complete, up-to-date information and seeing that this information is available to all those who are in need of it. Remain current on all legislative and business trends which could have an impact on the corporation and the industries in which it is involved so that the annual planning report written and submitted

states she did not assist in preparing the job description. *Id.*, ¶ 21. Ward, however, states Miller helped prepare the job description contained in the 1985 JAQ. 1st Ward Aff., ¶ 12. After the 1985 JAQ was completed, Miller did not receive any feedback, positive or negative, regarding it. Miller Aff., ¶ 20.

In December of 1985 Miller received additional year-end compensation in the amount of $6,500 for 1985. *Id.*, ¶ 24. Miller also received a $2,000 salary increase for 1986 making her annual base salary $49,300 for 1986. *Id.*, ¶ 25. In January 1986 Miller first spoke to her superiors about being promoted to Vice President of Government Relations.[13] Walsh was the last person to hold a Vice President position in Government Relations. At the time he assumed the position, he had twenty-two years of legal experience. *Id.*, ¶ 26.

Miller spoke to Ward about a possible promotion in March 1986. *Id.*, ¶ 27. Ward, in turn, handed Miller a Bentrak which he had prepared (the "1986 Bentrak"). The 1986 Bentrak expressed critical views regarding Miller's Interpersonal Skills and Professional Skills. *Id.*, ¶ 27; 1st Ward Aff., ¶ 13. Beneficial paraphrased the 1986 Bentrak remarks as follows:

> In the category of "Interpersonal Skills," it was noted that [Miller's] motivation was excellent, but that she had problems in communications and in supervising subordinates. With regard to "Professional Skills," an improvement was noted in substantive knowledge, but also a consistent tendency to jump to conclusions without fully understanding the problem. The Bentrak stated that [Miller's] inability to distinguish important legislation and problems from unimportant ones adversely affected her productivity. The Bentrak did note that her technical skills such as bill drafting and analysis were good and improving and stated that these skills should continue to improve as

she gained a better understanding of the business context. With regard to "Management Skills," it was noted that [Miller's] initiative, energy, dependability and ambition were excellent, with the caveat that her ambition sometimes appeared excessive. It also was noted that [Miller's] attitude toward others was considered condescending and counterproductive. In addition, the Bentrak stated that her decision-making ability suffered from her reluctance to inquire into the background of matters and to ask penetrating questions.... Finally, the Bentrak noted that [Miller's] judgment was not trusted by some and suggested that this may have been due to [Miller's] relative lack of business and industry experience.

Defs.' 12G Statement, ¶ 19.

Discussion of the 1986 Bentrak was postponed to the weekend at which time Ward agreed not to put the 1986 Bentrak in her personnel file. 1st Ward Aff., ¶ 13. After Miller received the 1986 Bentrak, Ward stated Miller worked hard in connection with Legislative monitoring, however, she continued to have problems giving helpful practical advice and making sound decisions. *Id.*, ¶ 14. Ward stated, therefore, he never gave her the same authority which Walsh had. *Id.*

On 25 June 1986 Miller attended a fund raiser sponsored by Beneficial. Miller Aff., ¶ 28. Miller states that during the fund raiser she spoke to Caspersen regarding a political contribution. During her conversation with Caspersen, Miller stated the following was said:

> ... Caspersen referred to me as "the bag lady." I then told Mr. Caspersen that I was not a "bag lady" at which point he said "I meant a bag lady in New York." After this conversation, I walked over to talk with David Ward. When he asked me what had gone on between me

to the corporate Planning Department will be of value to those ultimately responsible for long range planning.
Miller Aff., Ex. 6.

**13.** Miller first raised the issue to Farris in January 1986. Farris was open to the idea and told

Miller to speak to Ward. Later that year, Miller spoke to James Gilliam, Senior Vice President and General Counsel ("Gilliam"), about a promotion and he too told her to speak to Ward. Miller Aff., ¶ 26.

and Mr. Caspersen, I informed him that Caspersen had called me a "bag lady." *Id.* Miller stated Ward referred to her as the bag lady on 26 June 1986 at her office and again on 27 June 1986 at a party for a colleague. *Id.*, ¶¶ 29–30. After Ward's second reference to Miller as the bag lady, Miller indicated she did not like being referred to by the term. *Id.*, ¶ 29. On 30 June 1986, Miller states Ward once again referred to her as the bag lady, at which point she requested that he not refer to her by the term again. *Id.*, ¶ 30.

Throughout 1986 and 1987 Miller spoke to Ward about the fact that she had not been promoted to Vice President. *Id.*, ¶ 32. Miller maintains Ward responded by saying she was "making the money," therefore, did not need the title. *Id.* In January 1987 Miller received year-end additional compensation in the amount of $8,000 for 1986. *Id.*, ¶ 33. Miller also received an increase in her salary making her total annual base salary $50,200. *Id.* Miller contends that throughout 1987 her workload continued to increase. The increase was due in part from Ward's appointment to the Operating Executive Committee of Beneficial Management which took away from his time to spend on Government Relations matters and from his involvement in a comprehensive restructuring of Beneficial. *Id.*, ¶ 34.

In September 1987 Miller again raised the issue of a promotion to Ward basing her request upon her increased workload. At this time, Miller stressed she had assumed the position of two attorneys and had increased the contact with legislators, regulators and high-level employees of companies. *Id.*, ¶ 35. In January 1988 Miller received $11,000 in year-end additional compensation for 1986 and received an increase in the amount of $3,000 making her annual base salary $53,200 for 1987. *Id.*, ¶ 36. Miller further states at the time of her raise, Ward assured her she was making the same pay as Walsh. *Id.* Ward states he never told Miller her compensation was close or equal to Walsh's compensation. 2d Ward Aff., ¶ 2. According to Ward, he told Miller "she was making money and getting good increases." Miller

Aff., ¶ 36. Miller's salary increases track Walsh's annual base salary increases. In fact, given Walsh's legal experience, Miller's annual base salary increases were in excess of Walsh's. When Miller was making $53,200, she had been in Government Relations for four years and had eight years of legal experience. At the time Walsh earned $53,000, he had been in Government Relations for six years and had twenty-eight years of legal experience.

Ward states despite his concerns regarding Miller's interpersonal skills, in February 1988, he recommended Miller for a promotion to Vice President. 1st Ward Aff., ¶ 15. This promotion was to be in title only. *Id.* As to this recommendation, Miller states the following:

> For the first time ... Ward told me that a recommendation that I be made a Vice President would not stand a chance because I did not have enough "seniority" with the company. I then pointed out that Mary Ann [sic] Schneider and Ann Stephenson had been brought into Beneficial as Vice Presidents (obviously without seniority at the company) and that Wheeler Neff, who began his employment at Beneficial the same day I did, had been promoted to Vice President. I noted how I had replaced Charles Walsh (and Kenneth Raatz) and had taken on some of Ward's duties over the years (all of which Ward acknowledged). I also told Ward that I did not think that David Farris would object to making me a Vice President. ...

Miller Aff., ¶ 38. Caspersen, however, told Ward the consideration for promotion would not occur at that time. *Id.* Sometime before 26 May 1988 Miller began to fill out a JAQ (the "1988 JAQ") upon the suggestion of Maryann Schneider, Senior Vice President for Human Resources ("Schneider"). Miller Aff., ¶ 40.

On 4 March 1988 Ward took a leave of absence from Beneficial to participate in an eleven-week program at Harvard University. *Id.*, ¶ 16. During Ward's absence, Miller was instructed to handle State legislation and administrative matters. The Government Relations Field Directors were

to review any major policy decisions with Caspersen or Farris and all federal Government Relations matters were to be referred to an outside consultant. *Id.* Miller presents a different account of her duties during Ward's leave of absence.

> While Ward was at Harvard, I ran the Government Relations Department without supervision by David Farris, Finn Caspersen or any other higher ranking executive.

Miller Aff., ¶ 41.

Ward returned to Beneficial on 23 May 1988. On or around 26 May 1988, Miller approached Ward regarding her promotion to Vice President. *Id.*, ¶ 42. Miller contends the conversation proceeded as follows:

> Ward responded that he had recommended to Finn Caspersen earlier in the year ... that I be made a Vice President and that Caspersen had turned down that recommendation.... When I asked Ward why he had not told me of this previously, he simply said something about it being a "white lie." Ward then went on to say that I would never get the title of Vice President and that Finn Caspersen had the total say in the matter. I then told Ward that Mary Ann [sic] Schneider had recommended that I draft a JAQ for the committee which evaluated promotions. Ward laughed and said that the committee did not make those decisions.

*Id.* According to Miller, Ward said "your best bet is to leave and sue on age discrimination" and to go work for the government who could not discriminate on the basis of age. *Id.* Ward states he never told Miller she should sue for age discrimination. 2d Ward Aff., ¶ 4. Miller also states Ward asked her how long she intended to work if she got the title of Vice President. Miller Aff., ¶ 42.

Ward allegedly told Miller he would recommend her for Vice President in July 1988 and she should compile a list of recent promotions from personnel. *Id.* Miller maintains that Ward suggested Miller ask Gilliam to assign her to another attorney position so Ward could hire someone who would be able to take over his position in three or four years. *Id.* Ward concedes Miller and he spoke of a replacement for Ward. 2d Ward Aff., ¶ 5. Ward states, however, he advised Miller she would most likely not replace Ward because he intended to stay at Beneficial for another seventeen years when he would be at retirement age. *Id.*

According to Miller, Ward suggested perhaps Caspersen would promote Miller to Vice President if Ward could hire someone beneath him to eventually replace Ward. Miller Aff., ¶ 43. Miller indicated to Ward if she were not going to be made Vice President, she would be interested in an available Field Director position. *Id.* According to Miller, Ward told her the position was not available because he could not have Miller carrying home drunks late at night.[14]

On 31 May 1988 Miller had a conversation in her office with Helen Perry. Miller secretly taped this conversation because "a certain level of mistrust had developed between [Perry and Miller.]" *Id.*, ¶ 43. Within a few days, Miller informed Ward she had taped the conversation with Perry.[15] *Id.* Miller states Ward made no comment about the taping incident. *Id.* According to Ward, he felt the taping incident was sufficient grounds to terminate Miller's employment. 1st Ward Aff., ¶ 17. Therefore, Ward told Miller she would no longer be recommended for a promotion. *Id.*

After learning of the taping incident, Ward decided to make a formal Bentrak documenting the taping incident and other performance problems. *Id.* Miller contends Ward assured her on 14 June 1988 that he would submit Miller's name for Vice President to be considered at the Group Presidents' Mid–Year Conference in

---

**14.** The position as Government Relations Director includes a lot of entertaining of clients. Miller Aff., ¶ 42.

**15.** Ward states that he learned about the taped conversation at the end of May. 1st Ward Aff., ¶ 17. He does not state how he learned of the taping incident.

July. Miller Aff., ¶ 44. On 2 August 1988 Miller asked Ward what the results were of his proposal to promote Miller. *Id.*, ¶ 45. Miller states:

> Ward responded that I had been turned down for Vice President by David Farris and Finn Caspersen. When I asked Ward if I could speak with Caspersen about the subject, Ward said that I would "be out the door" if I tried to do so. Ward agreed that I could speak with David Farris and Mary Ann [sic] Schneider about the Vice President title.

*Id.* Schneider advised Miller to prepare a list of job responsibilities including ten tasks Miller had recently completed. *Id.*, ¶ 46. Miller prepared the list and submitted it to Farris. Miller then met with Farris on the afternoon of 2 August 1988. *Id.* Miller stated Farris informed her he and Caspersen had not turned the promotion down and would consider it at the end of the year. *Id.* In addition, Farris instructed Miller to complete a JAQ. *Id.* Miller completed the 1988 JAQ on 29 August 1988.[16] The 1988 JAQ was delivered to Ward on 30 August 1988. *Id.*

Ward was not able to complete the formal Bentrak until 24 August 1988 (the "1988 Bentrak"). *Id.*, ¶ 19. On 1 September 1988 Ward added comments from the 1986 Bentrak to the 1988 Bentrak. On that same date, Ward received the 1988 JAQ from Miller which requested her job be upgraded to Vice President. *Id.*, ¶ 20. Ward informed Miller she was not going to become Vice President and never would. Miller Aff., ¶ 48. In addition, Ward told Miller her performance would have to be discussed. 1st Ward Aff., ¶ 20. Miller became upset; therefore, Ward requested the meeting be held with Lawrence Cole ("Cole"), Vice President of Human Resources. *Id.* Miller remained upset and was taken home. *Id.* Miller was out of work due until 26 September 1988. Miller Aff., ¶ 48. Ward drafted an addendum concerning the taping incident and the loss of trust of Miller at Beneficial to the 1988 Bentrak after the 1 September 1988 meeting with Miller and Cole. Ward did not, however, include the addendum in the 1988 Bentrak.[17] *Id.*, ¶ 21.

During Miller's absence from work, she wrote Ward a letter, dated 19 September 1988 ("19 September 1988 Letter"). *Id.*, ¶ 49; Hance Aff., Ex. 3. The 19 September

---

**16.** The 1988 JAQ summarized Miller's job responsibilities as follows:

> My responsibilities can be separated into three main divisions: (1) Those where I supervise and interact with the Government Relations Directors on an ongoing, day to day basis, and follow, write, analyze and guide literally hundreds of regulations and bills. This requires that I remain familiar with laws and regulations which affect all aspects of the corporation on both the state and federal level; (2) Those where I handle all of the myriad responsibilities of three corporate PACs and the legality, approval and disclosure of all of the political contributions made by the PACs, the various corporations within the Beneficial structure, and the Caspersen family; and (3) Those where I represent Beneficial outside the corporate setting e.g. as a member, on committees, on boards, and as a speaker for organizations such as the International, Credit Association, the American Bankruptcy Institute, the American Financial Services Association, the National Foundation for Consumer Credit, the Coalition of Service Industries, the Center of American Women in Politics, the National Organization of Women Legislators, and the National Council of State Legislators, etc.

Miller Aff., Ex. 13.

**17.** The Addendum provided, in pertinent part:

> Your position as attorney for the Government Relations Department requires you to earn the trust and respect of those you deal with, including your immediate supervisor, top management, the staff at headquarters, and the Government Relations Directors. In this latest incident on September 1, 1988 you have definitely lost the trust of your immediate supervisor.
>
> I told you shortly after returning from Harvard that the question of your promotion had been discussed with my superiors, that no promotion would be forthcoming, and that a promotion would not be recommended again this year. You were also specifically told by me that I considered your secret taping of a meeting with Helen Perry to have been a serious mistake and very poor judgment on your part. Despite this, I learned that you had nevertheless proceeded to approach Mr. Farris, Ms. Schneider, and Mr. Cole in an apparent attempt to have them obtain a promotion for you. While you no doubt have a right to seek a promotion if you wish, doing so under these circumstances indicates to me a lack of common sense.

1st Ward Aff., Ex. 14.

1988 Letter stated Miller consistently refused to participate in what she contended were illegal or unethical activities. *Id.* The 19 September 1988 Letter further stated Beneficial's failure to promote her to Vice President was due to the fact that Miller was sixty years of age. *Id.* When Miller returned to work on 26 September 1988, Cole and Schneider questioned Miller about the 19 September 1988 Letter. *Id.* On that same day, Ward removed the majority of Miller's principal duties. *Id.* As a result of the 19 September 1988 Letter an internal investigation was conducted regarding Miller's employment history at Beneficial. *Id.,* ¶ 52.

On 30 September 1988 Miller telephoned Walsh to apprise him of her frustrations at Beneficial. *Id.,* ¶ 50. During their conversation, Walsh mentioned his compensation when he left Beneficial was an annual base salary of $55,000 and an additional year-end bonus of $28,500. *Id.* Walsh also informed Miller that Raatz had an annual base salary of $40,500 and had an additional year-end bonus in the amount of $6,500 for 1983. *Id.* Miller states this was the first time she became aware Walsh received higher compensation than her. *Id.,* ¶ 51.

On 3 October 1988 Ward submitted to Human Resources a written response to the 1988 JAQ. *Id.,* ¶ 22. On 5 October 1988 Human Resources advised Ward that Miller's position should remain at the same salary grade level. *Id.* The 1988 Bentrak was signed and delivered to Miller on 14 October 1988.[18] *Id.,* ¶¶ 19, 23. Upon receipt of the 1988 Bentrak, Miller stated she

would respond to Hance after her attorney reviewed the matter. *Id.,* ¶ 23.

On 20 October 1988 Miller was removed from Government Relations and reassigned to the Legal Department as Assistant Vice President and Associate Counsel where she reported to Hance. Miller Aff., ¶ 53. On 14 December 1988 Miller was informed her temporary removal from Government Relations was permanent. *Id.* In connection with her notice of the permanent transfer, Miller received a memorandum from Hance, dated 14 December 1988. Defs.' 12G Statement, ¶ 30; Hance Aff., ¶ 10. The memorandum stated the reasons for the transfer and directed Miller to discuss the 1988 Bentrak with Hance. *Id.* On 19 December 1988 Miller met with Hance to discuss the 1988 Bentrak. *Id.,* ¶ 11.

Miller contends her removal from Government Relations foreclosed any possibility of her being promoted to Vice President. Miller Aff., ¶ 54. Any promotion to Vice President would have been based on the scope and nature of Miller's duties and the fact that Walsh had been a Vice President. *Id.* On 22 December 1988 Beneficial's Executive Committee considered and denied Miller's request for promotion to Vice President. Defs.' 12G Statement, ¶ 32. The decision was based in part on Hance's recommendation that Miller not be promoted for reasons stated in the 1988 Bentrak. *Id.;* Hance Aff., ¶ 12. Miller was informed of Beneficial's decision on 23 December 1988. *Id.*

On 6 January 1988 Miller's employment at Beneficial was terminated.[19] *Id.,* ¶ 60. On 27 February 1989 Miller filed a charge of employment discrimination with the

---

**18.** Beneficial paraphrased the remarks in the 1988 Bentrak as follows:

[Miller's] "Administrative Skills" were criticized with regard both to her general administration of Government Relations in Ward's absence while at Harvard and, specifically, in her secret taping of a conversation with another department member. "Interpersonal Skills," noted as a problem in 1986, were judged to have worsened. It was noted that [Miller's] overly aggressive attitude toward the question of promotion interfered with her ability to do the job and that she continued to be unable to manage and get along with her subordinates. With regard to "Professional

Skills," the Bentrak noted serious questions concerning [Miller's] judgment and discretion.... In the section on "Management Skills," [Miller's] ability to make appropriate decisions was questioned. [Miller's] performance was rated "below expectations" in each category.

Defs.' 12G Statement, ¶ 24.

**19.** Beneficial states Miller resigned on 6 January 1989. Moving Brief, 21. Miller states her employment terminated in January 1989 but does not indicate whether it was at the request of Beneficial. Complaint, 2.

Equal Employment Opportunity Commission ("EEOC"). *Id.*, ¶ 61, Ex. 37. On 20 July 1989 Miller filed the Complaint alleging discrimination under the EPA, ADEA, New Jersey Law Against Discrimination, ("NJLAD"), N.J.Stat.Ann., 10:5–1 *et seq.*, and the New Jersey Conscientious Employee Act, N.J.Stat.Ann. 34:19–1 *et seq.* Complaint. On 21 November 1989 Miller filed an Amendment to Complaint alleging discrimination under Title VII.

On 29 June 1990 Beneficial moved for partial summary judgment to dismiss Count Five of the Complaint alleging a violation of the New Jersey Conscientious Employment Act. On 24 July 1990 Count Five of the Complaint was dismissed for lack of pendant jurisdiction. Letter–Opinion and Order, filed 24 July 1990.

*Discussion*

Beneficial moves for dismissal pursuant to Fed.R.Civ.P. 12(b) on the ground that Miller's claims are barred by the statute of limitations. In the event any claims are not time barred, Beneficial moves for summary judgment pursuant to Fed.R.Civ.P. 56 on the ground that there is no genuine issue of material fact. Beneficial argues it had justified business reasons for not promoting Miller and for not paying Miller the same annual base salary as her predecessor Walsh. Moving Brief, 34–39; Reply Brief, 28–34.

A. *Motion to Dismiss*

Beneficial has moved to dismiss all Counts of the Complaint pursuant to Fed. R.Civ.P. 12(b)(6) on the ground that the Complaint is time barred by the statute of limitations. Because dismissal under Rule 12(b)(6) results in a determination on the merits at an early stage in the plaintiff's cause, the plaintiff is afforded the safeguard of having all its allegations taken as true and all reasonable factual inferences drawn in its favor. *Wisniewski v. Johns–*

*Manville Corp.*, 759 F.2d 271, 273, (3d Cir. 1985); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). *Accord Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Angelastro v. Prudential–Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.1985), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

█ When making a determination under Rule 12(b)(6), the court cannot consider matters outside the pleadings. In this case, the parties have submitted affidavits in connection with the motion of Beneficial. When either or both parties present extraneous material as part of their motion or opposition, the court has the discretion to accept the extraneous material and convert the Rule 12(b)(6) motion to one for summary judgment pursuant to Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b); [20] *Rose v. Bartle*, 871 F.2d 331, 339–40 (3d Cir.1989); *Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737, 740 (D.N.J.1989); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1366 at 678 (West 1969 & Supp.1989).

█ In this case, the affidavits submitted by Beneficial and Miller directly impact upon the substantive issues raised by the motion to dismiss. Because affidavits have been submitted in support of and in opposition to the Rule 12(b)(6) motion, and because each side has had an opportunity to address a Rule 56 motion, the motion is converted to a motion for summary judgment. *Elysian Fed.*, 713 F.Supp. at 740. Accordingly, the motion will be treated as a summary judgment motion in its entirety.

20. Rule 12 of the Federal Rules of Civil Procedure states:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court,

the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed.R.Civ.P. 12(b).

B. *Summary Judgment Standard of Review*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task is to determine whether disputed issues of fact exist, but a district court may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see Nathanson v. Medical College*, 926 F.2d 1368, 1380 (3d Cir.1991) (Summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed."). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 75 (3d Cir. 1991); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989). " 'Any "unexplained gaps" in material submitted by the moving party, . . . if pertinent to material issues of fact, justify denial of a motion for summary judgment.' " *Ingersoll–Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1082 (3d Cir.1989)).

■ Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' . . . Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12), *cert. denied*, — U.S. —, 111 S.Ct. 2827, 115 L.Ed.2d 997, 59 U.S.L.W. 3837 (1991).

The Supreme Court elaborated on the summary judgment standard in *Anderson v. Liberty Lobby*: "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553–54 (footnote omitted).

Once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e); *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990) (nonmoving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1165 (3d Cir.1990) (cannot create issue of fact merely by questioning credibility of mov-

ant's witnesses; circumstantial evidence may raise issue of fact); *Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case"); *Carlson v. Arnot–Ogden Memorial Hosp.*, 918 F.2d 411, 413 (3d Cir.1990) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor") (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989).

### C. Statute of Limitations

#### 1. EPA and ADEA Claims

Claims arising under the EPA must be "commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued...." 29 U.S.C. § 255(a). The ADEA incorporates by reference the statute of limitations provided in the EPA. *See* 29 U.S.C. § 626(e)(1) ("Section 255 and 259 of this title shall apply to actions under this chapter.").[21]

■ "[T]he proper focus [in an employment discrimination suit] is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (emphasis in original). "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Delaware State College v. Ricks*, 449 U.S. 250, 257, 101 S.Ct. 498, 503–04, 66 L.Ed.2d 431 (1980). Accordingly, the court must determine when the alleged discriminatory act occurred. If the alleged discriminatory act is a "continuing violation" the statute of limitations accrues on the date of the last occurrence of the discrimination rather than the first. *Bronze Shields, Inc. v. New Jersey Dept. of Civil Serv.*, 667 F.2d

1074, 1081 (3d Cir.1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982); *Miller v. Aluminum Co. of America*, 679 F.Supp. 495, 499 (W.D.Pa.1988).

##### a. Continuing Violation

■ When confronted with a continuing violation claim, the first step is to determine the timeliness of the claim. *Erdmann v. Board of Educ.*, 541 F.Supp. 388, 392 (D.N.J.1982). The district court must "identify precisely the 'unlawful employment practice' of which [plaintiff] complains." *Bronze Shields*, 667 F.2d at 1083 (quoting *Delaware College*, 101 S.Ct. at 503). The Third Circuit has stated:

> To prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts of intentional discrimination. The preponderance of evidence must establish that some form of intentional discrimination against the ... [plaintiff] was the company's 'standard operating procedure.'

*Jewett v. International Telephone and Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.) (quoting *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)), *cert. denied*, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); *see also James v. International Bus. Machines Corp.*, 737 F.Supp. 1420, 1424 (E.D.Pa.1990).

■ The plaintiff may not base his or her claim upon conclusory allegations, but rather must provide factual support showing the defendant had a "standard and pervasive practice of intentionally discriminating against a class or classes of employees of which [the plaintiff] was a member." *James*, 737 F.Supp. at 1424–25. Moreover, "[t]he continuing violation theory does not cover '*isolated instances* of discrimination concluded in the past, even though the *effects* persist into the present.'" *Cuffy v. Getty Refining & Marketing Co.*, 648 F.Supp. 802, 810 (D.Del.1986) (quoting *E.E.O.C. v. Westinghouse Elec. Co.*, 725

---

**21.** The ADEA places an additional restriction on the filing of claims. Under section 626 of the ADEA a plaintiff must file a charge of discrimination within three hundred days of the alleged unlawful employment practice. 29 U.S.C. § 626(d)(2). For the reasons set forth below, the charge Miller filed with the EEOC on 27 February 1989 was untimely.

F.2d 211, 218 (3d Cir.1983) (emphasis in original)). "[T]o withstand a motion for summary judgment as to untimely charges, a plaintiff must at a minimum identify the policy or practice upon which the claim of continuing violation is based...." *Erdmann*, 541 F.Supp. at 393; *see also Porta v. Rollins Environmental Servs., Inc.*, 654 F.Supp. 1275, 1281–82 (D.N.J.1987), *aff'd* 845 F.2d 1014 (3d Cir.1988).

■ In this case, Miller's EPA and ADEA claims are based on an alleged disparity in salary and a failure to promote. Miller alleges Beneficial discriminated against her when it established and continued Miller's compensation and position in Government Relations. Complaint, Count 1, 3. With respect to Miller's claim based on the disparity in salary, Miller argues the alleged discrimination occurred when Beneficial promoted Miller to Government Relations without giving her the same compensation as Walsh. Complaint, 4–5; Opp. Brief, 21. Miller avers this discrimination continued each time she received a paycheck from Government Relations. *Id.* Miller claims because there was a continuing violation, the statute of limitations has not run on her claims based on the alleged disparity in salary. Opp. Brief, 20.

In making her assertion of a continuing violation, Miller relies on *Gibbs v. Pierce County Law Enforcement Support Agency*, 785 F.2d 1396, 1399–40 (9th Cir.1986) ("The policy of paying lower wages to female employees on each payday constitutes a 'continuing violation.'") and *Bartelt v. Berlitz School of Languages, Inc.*, 698 F.2d 1003, 1004 (9th Cir.1983) (same). These cases are distinguishable, however, because Miller failed to establish a *policy* of paying females lower wages than male counterparts. All of Miller's allegations with respect to unequal pay deal only with her salary compared to the salary of Walsh. Opp. Brief, 20–22. Miller makes no allegations with respect to the salary of other females or employees over forty years of age.

Even assuming Beneficial discriminated against Miller when her position in Government Relations was established, the fact that Miller's subsequent promotions never reached the annual base salary level of Walsh does not constitute individual acts of discrimination. Beneficial gave Miller percentage raises based on merit. Any subsequent raises Miller received were based upon her initial annual base salary received in Government Relations. *See* Miller Aff., Ex. 34. Therefore, the amount of the raises were but a consequence of the initial discriminatory act. *See e.g., Churchill v. Int'l Bus. Machines, Inc.*, 759 F.Supp. 1089, 1100 (D.N.J.1991) (where salary increases are based on merit and performance, prior salary has significant impact on subsequent salary level). "As a consequence, the continuing violation theory will not resuscitate a failure to promote claim...." *Cuffy*, 648 F.Supp. at 810.

■ Miller also seeks to apply the continuing violation theory to her claim based on Beneficial's failure to promote her. Opp. Brief, 23. Miller argues because she filled the positions of Walsh and Raatz she was discriminated against when her position as Associate Counsel was established in Government Relations. *Id.*, 22–24. Miller contends each subsequent denial of her requests for a promotion to Vice President constituted a continuing violation on the part of Beneficial. *Id.*

Miller does not allege a policy of failure to promote on the basis of age or gender. Miller argues, however, a continuing violation can exist if there is a series of separate but related discriminatory acts. *Id.*, 24; *see Fuchilla v. Prockop*, 682 F.Supp. 247, 258 (D.N.J.1987) (pattern of discrimination shown because incidents were related to action taken against plaintiff in retaliation for filing claim); *Porta v. Rollins*, 654 F.Supp. 1275, 1281–82 (D.N.J.1987) (where there were no other women at her level, plaintiff established continuing violation by showing she was subject to series of related discriminatory acts); *Brown v. Brown*, 528 F.Supp. 686, 690 (D.N.J.1981) (continuing violation established where practices complained of included denial of specific promotion and denial of opportunity to prepare for promotional opportunities).

In this case Miller does not argue she was the only female at Beneficial at the level of Assistant Vice President seeking a promotion to Vice President. In fact, Miller admits there were other female Vice Presidents, albeit not a large number, at Beneficial. Miller's 12G Statement, ¶¶ 76–80. Accordingly, *Porta* is distinguished from the instant case.

In *Erdmann*, plaintiff argued the repeated rejection of her job application evidenced a continuing violation. 541 F.Supp. at 393. The court rejected plaintiff's claim that there was a continuing violation because:

> Although plaintiff's claims do fall into a consistent pattern of rejection, she has given no indication that the pattern has been generated by operation of any policy or practice used by defendants in making employment decisions, or that the pattern holds true with respect to female applicants in general.

*Erdmann*, 541 F.Supp. at 393. The court further considered the evidence and held even if plaintiff had alleged a systematic practice of discrimination, the facts do not support the allegations. *Id.* at 393–94.

*Erdmann* is on point in this case. Miller has not alleged a specific policy or practice of discrimination. Miller has only raised allegations that Beneficial has repeatedly rejected her requests to be promoted to Vice President. Even assuming Beneficial discriminated against Miller by not initially promoting her to Vice President, the facts do not support a showing of a discriminatory policy. Miller has presented statistical evidence to show that Beneficial only had two female Vice Presidents at the close of any given year. Miller does not, however, provide the requisite factual evidence to support a claim of a discriminatory policy against promoting women.[22]

Because Miller has failed to identify and factually support a showing of a discriminatory policy at Beneficial, Miller cannot withstand summary judgment on the basis that her claims were a continuing violation. Accordingly, it must be determined when

the specific alleged discriminatory conduct occurred and whether her claims are barred by the statute of limitations.

b. *Accrual of the Statute of Limitations*

Miller argues the statute of limitations did not begin to run on her claim for equal pay until she discovered the disparity in salary in September 1988. Likewise, Miller contends the statute of limitations on her claim for failure to promote did not begin to run until she discovered, in September 1988, she would never be promoted. In the alternative, Miller argues the statute of limitations for her claims for unequal pay and failure to promote should be tolled under principals of equitable tolling.

i. *Discovery*

 Relevant decisions of the Supreme Court clearly indicate that the limitations periods require prompt filing of discrimination charges. *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989); *Delaware State College,* 449 U.S. 250, 101 S.Ct. 498; *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In *E.E.O.C. v. Westinghouse Elec. Corp.,* 651 F.Supp. 1172 (D.N.J.1987), *aff'd,* 907 F.2d 1365 (3d Cir.1990), three requirements for the accrual of the statute of limitations were laid out.

> First, there must be an allegedly discriminatory policy or decision. Second, the allegedly discriminatory policy or decision must be communicated to the alleged victims of the policy. Finally, the policy or decision must be applied to the alleged victims.

*Id.,* at 1174; *see also Delaware State College,* 449 U.S. at 258, 101 S.Ct. at 504 (accrual is when discriminatory acts occurred, not when the effects were felt). The second factor, knowledge of the alleged victims, can be established by actual or constructive knowledge. *Miller v. Aluminum,* 679 F.Supp. at 500 ("filing period does not begin to run 'until the facts that

22. The validity and reliability of statistical evidence will be fully discussed in the section of

this opinion addressing the merits of Miller's discrimination claims. *See infra,* p. 969.

would support a charge of discrimination ... were apparent or should have been apparent to a person with a reasonably prudent regard for his rights....' ") (quoting *Tucker v. United Parcel Service,* 657 F.2d 724, 726 (5th Cir.1981)); *Westinghouse,* 651 F.Supp. at 1174–77 (same).

▮ In this case, Miller defends against the motion on the ground that she did not have actual knowledge of the disparity in pay until 20 September 1988 when Walsh told her what his salary was at the time of his departure. Opp. Brief, 26. Beneficial argues, however, Miller should have known about the disparity in salary in 1984. Defs.' Reply Brief, 11–12. In *Westinghouse,* the surrounding circumstances were considered to determine when the operative accrual date should be set. 651 F.Supp. at 1176; *see also Hamilton v. 1st Source Bank,* 928 F.2d 86, 89 (4th Cir.1990) (The court rejected discovery principal for unequal pay claims because "unequal pay claims provide an employee the greater incentive to inquire: the typical pay violation occurs over a longer period of time than the typical discharge, and the employee ... is in constant contact with those who may provide evidence of discriminatory treatment.").

In this case Miller alleges Ward informed her on several occasions she was making the same money as Walsh. Miller Aff., ¶¶ 32, 36. Miller at times, however, indicates she had knowledge to the contrary. Significantly, when Miller replaced Walsh in Government Relations she had a different title than Walsh. Walsh was Vice President and she was an Associate Counsel. *Id.,* ¶ 6. Indeed, at the time of her promotion to Government Relations, Ward told Miller "with hard work and more experience in this facet of the business [she] could achieve Vice President status and pay." Miller Aff., ¶ 7. Miller's EEOC charge stated: "David Ward assured me at [the time I started] that I would *eventually* be awarded the title of Vice President with its accompanying salary and benefits." *Id.,* Ex. 37 (emphasis added).

Miller also stated she assumed she was making a salary comparable to Walsh's salary because Ward had told her she was replacing Walsh and Raatz. *Id.,* ¶ 8. Moreover, Miller had known Walsh throughout her employment in the legal department and was aware he had almost twenty years of legal experience at Beneficial by the time of his departure. By comparison, at that time Miller had four years of legal experience when she entered Government Relations.

Importantly, Miller, as an attorney is attuned to the issues of employment discrimination. *See e.g., Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 26 (2d Cir.) (distinguishing uneducated person unfamiliar with the law from well-educated lawyer for purposes of determining knowledge), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); *Pfister v. Allied Corp.,* 539 F.Supp. 224, 227 (S.D.N.Y.1982) (equitable tolling claim weak since plaintiff is experienced attorney). The record indicates Miller was cognizant of the fact she may be subject to age discrimination. When Miller applied to Beneficial in 1980, Miller stated she was born in 1931. Beneficial later learned that Miller was actually born in 1927 or 1928.[23] Moving Brief, 4 n. 1; 1st Ward Aff., Ex., 14.

The contradictions in Miller's statements and Miller's heightened knowledge and sensitivity to the issues of employment discrimination are persuasive evidence that if Miller did not know, she should have known she did not receive the same salary as Walsh when she replaced him in Government Relations. *Cf. Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1419 (3d Cir. 1991), *cert. denied* —— U.S. ——, 112 S.Ct. 379, 116 L.Ed.2d 330 (poor evaluation did not trigger Colgan's knowledge of discrimination because evaluation stated he could redeem himself by improved performance over next sixty to ninety days). Accordingly, from a view most favorable to Miller,

**23.** During oral argument, Miller's counsel suggested there was nothing improper about Miller having lied about her age.

she had at least constructive knowledge she was not making the same salary as Walsh when she accepted the position in Government Relations. The statute of limitations began to run when Miller formally assumed the position in Government Relations in July 1984.

 The statute of limitations also began to run in July 1984 for Miller's claim for failure to be promoted to Vice President. The Complaint alleges she was discriminated against when her position was established in Government Relations. Complaint, 6–7; Amendment to Complaint, 2. Miller does not assert she was unaware that Walsh's position was Vice President when she accepted the position as Associate Counsel. Accordingly, Miller had actual knowledge of any alleged discrimination at the time she accepted and assumed the position in July 1984.

Miller asserts, however, she was unaware that she would never be promoted until she was removed from Government Relations in October 1988. Opp. Brief, 28. Miller states Ward had never told her she would not be promoted to Vice President until her discussion with Ward on 1 September 1988. Miller Aff., ¶ 48. Miller states, however, Ward told her in February 1988 that any request for promotion to Vice President would not stand a chance because she lacked seniority. *Id.*, ¶ 38. Miller responded to Walsh by naming various employees at her level who had received promotions. *Id.* This response indicates she suspected some form of discrimination.

Events prior to February 1988 indicate Miller had constructive knowledge of discrimination. As previously mentioned, Miller was an attorney and was sensitive to the issues of age discrimination. Moreover, to establish her case of discrimination, Miller cites statements made in 1986 referring to her as a "bag lady." At the time of these statements, Miller had already requested promotions to Vice President. Assuming the "bag lady" references are evidence of a discriminatory animus, Miller should have known in 1986 that she was not going to be promoted to Vice Pres-

ident. Accordingly, Miller has not laid out a proper situation to prevent the accrual of the statute of limitations.

ii. *Equitable Tolling*

 Miller argues, in the alternative, the statute of limitations was tolled by the principles of equitable tolling. Opp. Brief, 30–32. Equitable tolling "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence [s]he is unable to obtain vital information bearing on the existence of [her] claim." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir.1990) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946)); *see also Meyer v. Riegel Products Corp.*, 720 F.2d 303, 309 (3d Cir.1983) (humanitarian purposes of employment discrimination claims implies limitation is subject to tolling in appropriate cases).

 The Third Circuit has noted, however, the "restrictions on equitable tolling ... must be scrupulously observed." *Williams v. Army and Air Force Exchange Service*, 830 F.2d 27, 30 (3d Cir. 1987). The doctrine can be applied where "the defendant has actively misled the plaintiff." *Kocian v. Getty Refining & Marketing, Co.*, 707 F.2d 748, 753 (3d Cir. 1983); *Miller v. Aluminum*, 679 F.Supp. at 500. In such cases where the "employer's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate his rights" equitable tolling of the statute of limitations is appropriate. *Meyer*, 720 F.2d at 307; *Labus v. Navistar Int'l. Transp. Corp.*, 740 F.Supp. 1053, 1058–59 (D.N.J.1990).

 It has also been noted, however:

An employee's hope for rehire, transfer, promotion, or a continuing employment relationship ... cannot toll the statute absent some employer conduct likely to *mislead* an employee into sleeping on his rights.

*Price v. Litton Bus. Systems, Inc.*, 694 F.2d 963, 965–66 (4th Cir.1982). To invoke equitable tolling, the employee must "show that it would have been impossible for a

reasonably prudent person to learn" of the discriminatory conduct. *Miller v. IT & T,* 755 F.2d 20, 24 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985).

■ Miller has not established a case for equitable tolling with respect to her claims based on disparity in salary. Miller alleges Ward actively misled her when he told her she was making the same money as Walsh. Opp. Brief, 31. The facts are disputed as to whether Ward told Miller she was making the same salary as Walsh. 2d Ward Aff., ¶ 2. A resolution of the dispute is neither necessary nor proper, however.

As previously stated, Miller had constructive knowledge of the fact that she was not making the same salary as Walsh. Not only did Miller have constructive knowledge of the alleged discrimination, but any statement of Ward's would not be "extraordinary enough" to have prevented Miller from gaining knowledge of her claim. *See e.g., Dillman v. Combustion Eng'r, Inc.,* 784 F.2d 57, 60 (2d Cir.1986) (offering employee severance benefits was not misleading conduct responsible for employee's unawareness of discrimination); *Miller v. IT & T,* 755 F.2d at 24 (extraordinary circumstances exist if it would be impossible for reasonably prudent person to learn discharge was discriminatory because of acts of employer).

■ Miller also asserts the principle of equitable tolling should be applied to her claims for failure to promote. Opp. Brief, 31. Miller states Ward assured her he would submit her name for a promotion. *Id.* Miller further claims Schneider's and Farris' suggestions to prepare a JAQ mislead her to believe she was eligible and would receive a promotion. *Id.*

Although equitable tolling is not limited for only egregious acts or acts of deception, *Meyer,* 720 F.2d at 307, the inference cannot be drawn that Beneficial intended to lull Miller into sitting on her rights. In *Labus,* the defendant informed a terminated employee that attempts were being made to locate another position and the company flew the employee to Florida for the purpose of reassignment. 740 F.Supp. at 1059. The *Labus* court held, under these circumstances, the employee may have been lulled into sitting on his rights. *Id.* In *Meyer,* the plaintiff was misled because the defendant sent plaintiff a letter stating he was fired because of a reorganization of his division. 720 F.2d at 307.

In this case, Miller was told her name would be submitted for a promotion, but she was never given assurances that the promotion would be approved. Miller knew Ward was not the controlling person in the decision, but rather the approval had to come from the executive committee. Miller Aff., ¶ 43. Moreover, Miller was aware as early as 1986 that her performance was far short of exemplary. Indeed, Miller asked that her 1986 Bentrak not be included in her personnel file. 1st Ward Aff., ¶ 13. Miller was also sensitive about the fact that her age may be a hurdle to employment, as evidenced by her lying about her age on her resume. 1st Ward Aff., Ex. 14. Lastly, Miller interpreted the references in 1986 to her as a "bag lady" to be discriminatory. Miller Aff., ¶¶ 29–30; Opp. Brief, 50. Nonetheless, Miller contends the encouragement from her superiors misled her to believe she was a viable candidate for a promotion. Hance Aff., Ex. 3; Opp. Brief, 30–32.

As was noted in *Price:*

> The statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in timely fashion is the consequence ... of actions that the employer should *unmistakably* have understood would cause the employee to delay filing his charge.

694 F.2d at 965 (emphasis added). In light of the above-cited facts, Miller has not established or even suggested facts to which the doctrine of equitable tolling can be applied.

Miller's claims arising out of a disparity in salary and failure to promote are time barred because the cause of action accrued

in July 1984.[24] Summary judgment is granted with respect to Count One and Count Three because the claims are barred by the statute of limitations.

### 2. Title VII Claims

▮ Under Title VII Miller was required to file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e–5(c). Miller filed her charge with the EEOC on 27 February 1989. For the reasons set forth above, the alleged unlawful employment practice occurred in July 1984 when Miller transferred to Government Relations. Accordingly, Miller's charge filed with the EEOC on 27 February 1989 was beyond the 300 day filing requirement. Summary judgment is granted on Count VI.

### 3. NJLAD Claims

▮ Miller alleges supplemental jurisdiction (previously known as pendent jurisdiction) for Counts Two and Four. Complaint, 2. Supplemental jurisdiction enables federal courts to hear state law claims over which there is not an independent basis of jurisdiction. 28 U.S.C. § 1367; *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). Supplemental jurisdiction depends upon the existence of subject matter jurisdiction over other claims in the action. Section 1367(c) permits a court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

In this case, Miller alleges federal question jurisdiction, not diversity jurisdiction. Complaint, 2. For the reasons set forth above, summary judgment is granted on Counts One, Three and Six because they are time-barred. Because no other ground for supplemental jurisdiction is alleged, supplemental jurisdiction will no longer be exercised in this case. *United Mine Work-*

*ers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3).

▮ Assuming a basis for supplemental jurisdiction does exist, the applicable statute of limitations under NJLAD must be determined. Beneficial argues that the applicable statute of limitations to be applied to the NJLAD is the two-year limitation that has been applied to civil rights personal injury claims. Moving Brief, 23. Miller argues her claims brought under the NJLAD are not time barred because the statute of limitations applied to the NJLAD is six years. Opp. Brief, 33–37.

The New Jersey Supreme Court has not addressed the issue of the applicable statute of limitations under the NJLAD. *Carrington v. RCA Global Communications, Inc.*, 762 F.Supp. 632, 642 (D.N.J.1991); *White v. Johnson & Johnson Products, Inc.*, 712 F.Supp. 33, 37 (D.N.J.1989). " 'In the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule.' " *Blum v. Witco Chemical Corp*, 829 F.2d 367, 376 (3d Cir. 1987) (quoting *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981)).

Where " 'the New Jersey Supreme Court has not directly addressed the issue now before the court' ... 'the decisions of the lower appellate courts may be persuasive, [they] should be accorded proper regard and are *presumptive evidence* of state law.' " *Carrington*, 762 F.Supp. at 642–43 (quoting *Copeland v. Johns–Manville Products Corp.*, 492 F.Supp. 498, 501 (D.N.J.1980) and *Commercial Union Ins. Co. v. Bituminous Casualty Corp.*, 851 F.2d 98, 101 (3d Cir.1988)).

In this case, Beneficial argues the decisions of New Jersey Appellate Division are based on overruled law. Moving Brief, 23 n. 8. Beneficial states the lower court decision in *Leese v. Doe*, 182 N.J.Super. 318 (Law Div.) 440 A.2d 1166 (1981), to apply

---

**24.** It is not necessary to determine whether the alleged discriminatory conduct was willful under either the EPA or the ADEA. Even if the three year statute of limitations for willful dis-crimination applies to Miller's claims, the three years would have expired in July 1987. Miller did not file the Complaint until November 1989.

the six-year statute of limitations was based on federal law set forth in *Davis v. U.S. Steel Supply,* 581 F.2d 335 (3d Cir. 1978). Beneficial states *Leese* and its progeny cannot be relied upon because the rationale of *Davis* was effectively overruled by the Supreme Court and the Third Circuit. Moving Brief, 23 n. 8; *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir.1985).

In *Wilson,* the Supreme Court stated discrimination claims under the civil rights statutes were analogous to personal injury claims and should be subject to the state's statute of limitations for personal injury claims. 471 U.S. at 276–79, 105 S.Ct. at 1947–49. Because the *Leese* court looked to pre-*Wilson* federal law to determine that the six-year statute of limitations should apply, Beneficial argues the New Jersey Supreme Court would now look to post-*Wilson* federal law to decide the issue. Reply Brief, 3–4. Under post-*Wilson* federal law, Beneficial argues, the New Jersey Supreme Court would apply a two-year statute of limitations to the NJLAD. *Id.,* 4.

Although the District Court in *White,* 712 F.Supp. at 36–38, applied the above rationale, the *Carrington* court found the argument unpersuasive. 762 F.Supp. at 642–45. Every New Jersey lower court that has decided the issue has found the six-year statute of limitations to be applicable. *See Id.* at 644; *see e.g., Fisher v. Quaker Oats Co.,* 233 N.J.Super. 319, 320, 559 A.2d 1 (App. Div.), *cert. denied,* 117 N.J. 628, 569 A.2d 1331 (1989); *Nolan v. Otis Elevator,* 197 N.J.Super. 468, 473–74, 485 A.2d 312 (Law Div.1984), *rev'd on other grounds,* 102 N.J. 30, 505 A.2d 580, *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 38 (1986); *Leese v. Doe,* 182 N.J.Super. at 321, 440 A.2d 1166.

Moreover, subsequent lower court decisions in New Jersey have held the six-year statute of limitations should be applied to NJLAD claims without relying on the decision in *Leese. Carrington,* 762 F.Supp. at 645; *see e.g., Fisher,* 233 N.J.Super. at 323–34, 558 A.2d 1 (federal ADEA does not preempt statute of limitations applicable to NJLAD); *Nolan,* 197 N.J.Super. at 472–74, 485 A.2d 312 (applicable statute of limitations is six-years). As stated in *Carrington:*

> There is little reason to believe that New Jersey courts will exhibit slavish devotion to federal law in interpreting the NJLAD. Quite the contrary, in construing New Jersey antidiscrimination law, enacted nearly twenty years before the analogous federal statute prohibiting employment discrimination, ... New Jersey courts have not considered themselves bound by federal case law, "even though [the NJLAD] relates essentially to the same subject matter as the parallel federal civil rights law. We are free to apply our own concept of that which is right and proper in the circumstances."

762 F.Supp. at 644 (quoting *Castellano v. Linden Board of Educ.,* 158 N.J.Super. 350, 360, 386 A.2d 396 (App.Div.1978), *modified on other grounds,* 79 N.J. 407, 400 A.2d 1182 (1979). Given the consistent view of the New Jersey state courts, the applicable statute of limitations of the NJLAD is deemed to be six years.

As previously determined, however, there is a lack of subject matter jurisdiction in this matter. Accordingly, supplemental jurisdiction cannot be invoked. *See supra,* pp. 958–959. Therefore, the motion for summary judgment as to Counts Two and Four is granted.

### D. *Discriminatory Conduct*

Beneficial argues to the extent Miller's claims are not time barred, no genuine issue of material fact exists with respect to the underlying discrimination claims. Moving Brief, 30. Beneficial contends Miller is unable to establish a *prima facie* case under the EPA, the ADEA, Title VII and the NJLAD. *Id.* Beneficial further argues even if Miller establishes a prima facie case of discrimination under any of her claims, Beneficial had legitimate nondiscriminatory reasons for not paying Miller the same salary as Walsh and for not promoting Miller to Vice President. *Id.,* 34–39. Although summary judgment has been grant-

ed on all counts on the basis of the statute of limitations, the merits of the underlying claims will be discussed.

### 1. *EPA Claim*

 To establish a prima facie case of discrimination under the EPA,[25] Miller must demonstrate that different wages were paid to employees of the opposite sex, that the employees performed equal work that required equal skill, effort and responsibility and that the employees had similar working conditions.[26] *Brennan v. Corning Glass Works,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); 29 U.S.C. § 206(d)(1); *Churchill,* 759 F.Supp. at 1095–96. To establish the equality of the positions, Miller cannot, however, rely on mechanical and surface similarities. *Byrnes v. Herion, Inc.,* 764 F.Supp. 1026, 1030 (W.D.Pa.1991); *Angelo v. Bacharach Instrument Co.,* 555 F.2d 1164 (3d Cir. 1977).

 After the plaintiff has presented a prima facie case of unequal pay, "the burden shifts to the employer to show that the differential is justified under one of the [EPA's] four exceptions." *E.E.O.C. v. Delaware Dep't of Health and Social Serv.,* 865 F.2d 1408, 1414 (3d Cir.1989). Under section 206 the employer can defeat a prima facie case of unequal pay by demonstrating that the wage differential results from: a system of seniority, a system of merit, a system which measures earnings by quantity or quality of production or a differential based on any other factor other than gender. 29 U.S.C. § 206(d)(1). Therefore, to prevail under the EPA, a plaintiff is required to show "that all factors are constant, such that the only possible explanation for the wage differential is sex." *Leroyal Peterson v. Department of Public Welfare,* Slip Op. No. 83–714 (E.D.Pa. 9 July 1985).

In this case, Beneficial argues Miller has not established a prima facie case of unequal pay under the EPA. Moving Brief, 31. Beneficial further argues, even if Miller has established a prima facie case, Beneficial has, as a matter of law, met its burden of persuasion to establish an af-

---

**25.** Section 206(d)(1) provides:

*No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.*

29 U.S.C. § 206(d)(1).

**26.** Miller bases her claim for unequal pay on the ground that at the time she accepted the position in Government Relations she had been told she was taking over the positions of both Walsh and Raatz, she had been trained by Walsh and Raatz as to the duties and responsibilities of each respective position, upon formally beginning the position she performed all of the duties listed as duties of a Vice President or duties

which Walsh had done and she received a starting annual base salary of $40,000 and Walsh had a total salary (base salary plus additional year-end compensation) of $84,000 in 1984.

Miller fails to state, however, that Walsh's annual base salary at the time he accepted a position in Government Relations was $41,000. LeRoux Aff., Ex. 6. Furthermore, at the time Miller left Government Relations, her annual base salary was $53,200. *Id.,* Ex. 1. Walsh's annual base salary after four years in Government Relations was only $49,000. *Id.,* Ex. 6. Walsh's annual base salary at the time he left, after eight years of service in Government Relations, was $55,000. *Id.* The remainder of Walsh's salary was additional year-end compensation which was awarded on the basis of the individual employee's merit. *Id.* Miller's claims for unequal pay represent a difference of $1,000 for the beginning annual base salary in Government Relations and difference of $1,800 for their ending annual base salary.

As well, her experience did not approach that of Walsh. Miller had four years of experience at the time she earned an annual base salary of $40,000, Walsh had twenty-two years of experience when he received $41,000 in annual base salary. By the time Miller received $53,200 in annual base salary, she had eight years of experience. When Walsh earned $53,000 in annual base salary, he had twenty-eight years of experience.

firmative defense. *Id.*, 34. Miller contends she has established a prima facie case of discrimination. Opp. Brief, 38. Miller further contends Beneficial's proffered rationale for the different salary is a pretext and that a jury could so conclude. *Id.*, 51–60.

▇ Without resolving the dispute as to whether Miller's position in Government Relations required equal skill, effort and responsibility as Walsh's position in Government Relations,[27] Beneficial has successfully met its burden by establishing the salary differentials between Miller and Walsh were based on factors other than gender. In *Leroyal Peterson*, the court stated "salary differentials based on objective criteria such as job duties and responsibilities, education, and experience, which are related to an employee's position do not violate the [EPA]." Slip Op. No. 83–714; *see also Strecker v. Grands Forks City Soc. Serv. Bd.*, 640 F.2d 96, 103 (8th Cir. 1980); *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir.1980); *Brian v. The Greif Cos.*, No. 88–5752, 1990 WL 204227, 1990 U.S.Dist.LEXIS 16878 (E.D.Pa. 7 Dec. 1990); *Serpe v. Four Phase Systems, Inc.*, 33 FEP Cases 169, 174–75 (N.D.Cal.1982), *aff'd in part rev'd in part*, 718 F.2d 935 (9th Cir.1983).

Beneficial rebuts Miller's case by explaining the disparity in her and Walsh's salaries was a result of the greater level of legal experience possessed by Walsh, his seniority at Beneficial and the quality of Walsh's work. Moving Brief, 31; Reply Brief, 21–24. Prior to leaving Beneficial, Walsh had worked eight years in Government Relations and had a total of thirty years of legal experience. In addition, Walsh's legal experience included extensive experience in government and legislation acquired before accepting the position in Government Relations. Walsh was employed at the State Attorney General's Office in Pennsylvania and had served as a deputy insurance commissioner of Ken-

tucky. 1st Walsh Dep., ¶¶ 4–6. In addition, Walsh had positions at a law firm and as counsel for a corporation before accepting employment at Beneficial. *Id.* In all of these jobs, and during the eight years at Beneficial before his employment in Government Relations, Walsh's responsibilities involved legislation and regulation of the insurance industry. Walsh's thirty years of legal experience was, therefore, an invaluable asset to Government Relations.

Miller entered Government Relations with four years of legal experience, all of which were in Beneficial's Legal Department. Although Miller gained legal experience reviewing and drafting legislation during her four years at Beneficial, she did not have the extensive background in government and insurance law Walsh had. This situation is different from the facts in *EEOC v. Hay Assocs.*, 545 F.Supp. 1064, 1084 (E.D.Pa.1982). In *Hay*, both Hyde and Bay performed estate planning analysis and were required to give seminars. 545 F.Supp. at 1078–79. The defendant justified the difference in Bay and Hyde's salary because of Hyde's prior business experience. The court stated, however, that Hyde's prior duties as an investment management officer were not related to the duties required by an estate planning analyst and could not be the basis of a legitimate justification for the disparity in salary. *Id.*, at 1084. In this case, Walsh's legal experience in government and law directly related to and greatly helped his career in Government Relations at Beneficial. Defs.' 12G Statement, ¶ 12.

In addition to a comparative lack of legal experience, Miller did not have the strong decision-making skills possessed by Walsh. Walsh received favorable employment reviews and had been entrusted with responsibilities outside of the scope of his position. Defs.' 12G Statement, ¶ 10; 1st Walsh Dep., 9–12; 1st Ward Aff., ¶ 6. In contrast, Miller received negative reviews with respect to her business judgment and

27. With respect to the issue of whether Miller performed the equal work of Walsh, Miller's affidavit contains a reply to Defendants' Responses to Requests for Admissions. In each

instance Miller asserts she did in fact perform the duties Beneficial denies Miller performed. Miller Aff., ¶¶ 56–58.

ability to make decisions.[28] Hance Aff., Ex. 6, 11. Moreover, Miller never gained Ward's respect and trust. In fact, Ward retained certain responsibilities he may otherwise have handed over to Miller but could not do so because of his lack of trust in Miller's capabilities. Ward Aff., ¶ 14.

In light of the significant differences in the legal experience of Walsh and Miller, as well as the significant difference in their ability to handle authority and policy-making decisions, Beneficial has demonstrated that Miller's salary was based on objective criteria permissible under the EPA. Summary judgment is granted with respect to Count One on the basis Beneficial has provided a legitimate, nondiscriminatory explanation for the salary differential.

### 2. *ADEA, Title VII and NJLAD Claims*

■ The standard of review for claims under the ADEA,[29] Title VII[30] and the NJLAD[31] involve the same analytical framework. *Retter v. Georgia Gulf Corp.,*

755 F.Supp. 637, 639 (D.N.J.1991); *Shaner v. Horizon Bancorp.,* 116 N.J. 433, 561 A.2d 1130 (1989). Therefore, Counts Two, Three, Four and Six will be dealt with together. To establish a prima facie case of employment discrimination Miller must demonstrate she is a member of the protected class, was qualified for the position sought and was denied it under circumstances giving rise to an inference of unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ After the plaintiff has established a prima facie case, the defendant has the burden to produce evidence of a "legitimate, nondiscriminatory reason for the employee's rejection." *Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093; *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.1991). If the defendant satisfies this burden of pro-

---

28. Miller's 1983 Bentrak ranked Miller's performance as fair and her potential as "fair within limitations." Defs.' 12G Statement, ¶ 3. Specifically, the 1983 Bentrak indicated Miller had difficulty making decisions and exercising interpersonal skills. Hance Aff., ¶ 3. Although Beneficial admits Miller had improved through hard work prior *to being offered the position* in Government Relations, Miller had not received the exemplary reviews Walsh had with respect to decision making and setting policy.

Miller continued to receive negative reviews regarding her ability to make decisions throughout her employment in Government Relations. Miller's 1986 Bentrak indicated she had a tendency to jump to conclusions before fully understanding the issue at hand. Defs.' 12G Statement, ¶ 19. The 1986 Bentrak further stated Miller's decision-making ability suffered because she was reluctant to make background inquiries and ask penetrating questions. *Id.,* Miller's 1988 Bentrak also indicated Beneficial had serious questions about Miller's judgment and discretion. *Id.,* ¶ 24. This last observation is borne out by the Miller taping incident.

29. Section 623 provides in pertinent part:
It shall be unlawful for an employer—
(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age ...
29 U.S.C. § 623(a).

30. Section 2000e provides in pertinent part:
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2.

31. Section 10:5–4 provides as in pertinent part:
All persons shall have the opportunity to obtain employment ... without discrimination because of race, creed, color, national origin, ancestry, age, marital status or sex, subject only to conditions and limitations applicable alike to all persons.
N.J.S.A. 10:5–4.

duction, the plaintiff has the burden of persuasion to prove by a preponderance of the evidence the defendant's legitimate, nondiscriminatory explanation is merely a pretext for discrimination. *Id.*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95; *Colgan*, 935 F.2d at 1422; *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). The plaintiff can prove pretext through either direct evidence to show "a discriminatory reason more likely motivated the employer" or indirect evidence to show "the employer's proffered explanation is unworthy of credence." *Billet v. Cigna Corp.*, 940 F.2d 812, 816 (3d Cir.1991); *see also Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096.

■ At the summary judgment stage in an employment discrimination case:

> "[A]ll that is required [for a nonmoving party to survive the motion] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve [at trial] the parties' differing versions of the truth...."

*Jackson v. University of Pittsburgh*, 826 F.2d 230, 233 (3d Cir.1987) (quoting *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). Although at the summary judgment stage factual inferences can never be made by a court, because intent is an element to a claim for employment discrimination it is critical that the court does not make factual inferences in favor of the movant. *Jackson*, 826 F.2d at 233 (citing *Marshall v. Ness*, 660 F.2d 517, 519 (3d Cir.1981). Accordingly, where issues of credibility exist, the court cannot grant summary judgment. "A plaintiff's general and conclusory 'allegations alone, [however] are insufficient to establish'" a genuine issue of material fact. *Miller v. Yellow Freight Systems, Inc.*, 758 F.Supp. 1074, 1078 (W.D.Pa.), *aff'd*, 941 F.2d 1202 (3d Cir.1991).

### a. *Prima Facie Case*

■ Beneficial argues Miller has failed to establish a prima facie case of discrimination under Title VII, the ADEA or the NJLAD. Although Miller was a member of the protected class, Miller fails to establish she was qualified for the position and salary paid to Walsh. At an executive level, the employee must be qualified for the technical and the managerial aspects of the position sought. *Spangle v. Valley Forge Sewer Auth.*, 839 F.2d 171, 174 (3d Cir.1988) ("inability to establish satisfactory performance of his supervisory duties would ... preclude Spangle from establishing that he was qualified to assume the position to which the duties were transferred"); *Perry v. Prudential–Bache Secs. Inc.*, 738 F.Supp. 843, 852 (D.N.J.1989) (plaintiff did not provide evidence that he performed supervisory obligations in manner satisfactory to employer).

In *Healy v. New York Life Ins. Co.*, 860 F.2d 1209 (3d Cir.1988), plaintiff argued he was qualified for a promotion because of his evaluations which rated his performance as good and indicated he had taken on additional responsibilities. 860 F.2d at 1215. The same evaluations, as well as affidavits, indicated Healy had weaknesses in the area of delegating work, expanding his area of focus and identifying future problems or objectives. *Id.* at 1214–15. The court noted, "although often complimentary, the reviews did note Healy had problems delegating authority and managing multiple projects—factors clearly relevant to the [sought for] demanding managerial job." *Healy*, 860 F.2d at 1215. Because of Healy's weaknesses in areas crucial to the sought for position, the court held the defendant offered a legitimate business reason for not promoting Healy. *Id.* at 1216.

In this case, Miller only provides conclusory allegations that she performed the same duties described in the job description of Vice President. She asserts, therefore, that she was qualified for the promotion to Vice President. Miller does not, however, establish she had acquired supervisory skills necessitated by the position of Vice President. *Cf., Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 49–50 (3d Cir. 1989) (plaintiff explained why alleged dis-

crepancy was not wrongdoing and offered testimony of supervisor to contradict defendants' reason for discharge). Indeed, the facts demonstrate the contrary. When Miller was promoted into Government Relations, her work efforts were laudable. Schwartz Certif., Ex. 1. Miller's 1983 Bentrak, however, indicated she had problems in interpersonal skills, providing practical advice and making decisions. Hance Aff., Ex. 2. Subsequent Bentraks indicated the same. *Id.*, Ex. 6.

Significantly, Miller's conduct indicated she was everything but capable to assume a supervisory position. In May 1988, while Ward was on a leave of absence, Miller covertly taped a conversation between her and a subordinate employee. Miller Aff., ¶ 43. As a result of this incident, tensions began to increase in Government Relations. Defs.' 12G Statement, ¶ 22. Miller's "job depends on good judgment, discretion and trust." 1st Ward Aff., ¶ 16. The egregiousness of the taping incident is further evidence that "[Miller's] obsession with promotion [was] damaging [her] ability to perform." *Id.*, Ex. 14, 4.

With respect to Miller's claim that she was qualified for the promotion, Miller cites her pay increases and promotion to Assistant Vice President as evidence that she was entitled to a promotion to Vice President. Miller, however, fails to address her negative ratings regarding management skills and interpersonal skills. "[P]romotion from a lower level job does not mean that problems do not exist which could affect performance in a more demanding job." *Turner v. Schering–Plough Corp.*, 705 F.Supp. 1048, 1051 (D.N.J.1989) (noting *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1215 (3d Cir.

1988)), *aff'd on different grounds*, 901 F.2d 335 (3d Cir.1990).

A promotion to Vice President brings with it additional managerial, supervisory and decision-making responsibilities. Miller's 1983, 1986 and 1988 Bentraks,[32] however, all indicated Beneficial had significant reason to doubt Miller's ability to successfully take on such additional responsibilities. Accordingly, the fact that Miller received pay increases and year-end bonuses for her performance as Associate Counsel and Assistant Vice President, does not necessarily mean Miller was qualified for a promotion to Vice President. Miller has not presented any evidence to refute Beneficial's concerns regarding her interpersonal skills and decision-making ability. Therefore, the favorable aspect of the reviews as Associated Counsel and Assistant Vice President are not sufficient to preclude summary judgment on the issue of whether Miller was qualified for promotion to Vice President.

b. *Legitimate Business Reason*

■ Even assuming Miller was qualified and, therefore, established a prima facie case, Beneficial contends it has a legitimate, nondiscriminating business reason for not promoting Miller in title and salary. Moving Brief, 35–39; Reply Brief, 26–28. Beneficial's explanation and Miller's claim of pretext must necessarily be considered to determine whether a genuine issue of material fact exists. The evidence will be reviewed in four areas: Miller's qualifications as represented by her evaluations and performance in Government Relations, Walsh's performance in Government Relations, the explanation offered by Beneficial and the specific evidence presented by Miller, including statistical evidence and refer-

---

**32.** Miller argues the 1988 Bentrak cannot be considered as evidence because it was only used in consideration of the December 1988 decision not to promote Miller. Opp. Brief, 52. Miller fails to acknowledge Ward decided to prepare the 1988 Bentrak in May 1988, and completed it in August and September 1988. Miller's claims for discrimination span from June 1984 through 29 September 1988. Although the 1988 Bentrak was eventually used for consideration in the December 1988 Bentrak, it documents facts that

occurred prior to the last alleged occurrence of discrimination. Importantly, Miller does not deny many of the facts contained in the 1988 Bentrak. The 1988 Bentrak is not a form of a post hoc evaluation that cannot be considered to determine the justified business reason for Beneficial's actions. *See e.g., Colgan,* 935 F.2d 1407, 1422; *Healy,* 860 F.2d at 1215–16; *Gunby v. Pennsylvania Elec. Co.,* 840 F.2d 1108, 11 (3d Cir.1988).

ences regarding Miller's age, to determine whether Beneficial's proffered reason is in fact a pretext for age and gender discrimination.

In reviewing the evidence and Beneficial's business justification, it is important to note:

> The legitimacy of the employer's proffered business justification will be affected both by the duties and responsibilities of the employee's position and the nature of the justification. Concomitantly, the significance of variations among an individual's personnel evaluations may well depend upon the nature of the employee's responsibilities; a more exacting standard of performance may have to be applied to positions of greater responsibility.

*Healy,* 860 F.2d at 1214.

Beneficial offers as evidence of Miller's lack of qualification for the position of Vice President her 1983, 1986 and 1988 Bentraks, in addition to several affidavits of her superiors attesting to Miller's specific weaknesses. Ward's affidavit indicates Miller had good organizational skills and was very aggressive with respect to PAC contributions. But with respect to interpersonal skills and decision-making ability, Ward states that Miller had problems giving helpful practical advice and making sound decisions. 1st Ward Aff., ¶ 14. Ward states because of Miller's lack of judgment and discretion, he never gave her the same authority previously given to Walsh. *Id.*

Hance states that he had seen similar weaknesses when he supervised Miller in the Legal Department. Hance Aff., ¶¶ 3–4. Ex. 2. Hance indicates Miller lacked communications skills with her subordinates and ability to thoroughly analyze a problem before jumping to a conclusion. *Id.* The statements in the affidavits are similarly supported by the formal evaluations of Miller in 1983, 1986 and 1988 Bentraks. Each of these Bentraks indicate a continuing problem in Miller's interpersonal skills and her inability to make sound decisions.

Miller argues these same Bentraks were the basis for salary increases and a pro-

motion from Counsel to Assistant Vice President and establish her qualifications for a further promotion. Opp. Brief, 56–57. In *Turner,* plaintiff relied on favorable reviews to show the pretextural nature of the defendant's explanation for the decision to demote plaintiff was a pretext. 901 F.2d at 343. The court noted, however, Turner had received less favorable reviews as well. *Id.* The issue for the court was not whether the more favorable reviews outweighed the less favorable reviews, but rather whether the defendant did not make the demotion decision for the reason it tendered. *Id.,* 901 F.2d at 344.

> [A plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions. The employee's perception of himself, however, is not relevant. It is the perception of the decision maker which is relevant.

*Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464–65 (7th Cir.1986) (citations omitted), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987); *see also Billet,* 940 F.2d at 828 ("employer's articulated reasons are not incredible simply because the employee asserts that such is the case").

Similarly, in this case the issue is not whether Miller received favorable reviews, but rather whether a rational factfinder could conclude that Beneficial did not promote Miller in title and salary to Walsh's level for a legitimate, nondiscriminatory business reason. As previously mentioned, however, the fact that Miller received salary increases or was promoted once before, does not necessarily mean Miller would be successful at a higher level. *Healy,* 860 F.2d at 1215; *Perry,* 738 F.Supp. at 853. Nor does the fact that Miller received complimentary reviews with respect to her hard work and organizational skills suggest that her weaknesses do not exist. Nor do Miller's complimentary reviews suggest that the areas of weakness are not important at the level of Vice President. Indeed, at the level of Vice President supervisory and decision-making skills are essential.

Miller does not offer any evidence to rebut Beneficial's legitimate, nondiscrimi-

natory concerns about her ability to be a successful Vice President. Miller, at best, has made self-interested assertions that she was entitled to be a Vice President. The favorable reviews are insufficient to preclude summary judgment given the specific weaknesses of Miller that would bear on her ability to be a successful Vice President.

Beneficial also provided evidence to show that Walsh was a highly regarded employee at Beneficial. Prior to Ward's position in Government Relations, Walsh had taken over many responsibilities actually designated to Helmuth Miller. 1st Walsh Dep., 25. During Walsh's employment in Government Relations, the field directors in Government Relations had learned to rely on him and come to him for advice. Ward Aff., ¶ 6. Walsh had displayed a high level of decision-making skills and had twenty years of legal experience in the business, including ten years experience at Beneficial prior to accepting the position in Government Relations. As mentioned, these are the specific attributes Beneficial felt Miller lacked. Accordingly, there is insufficient evidence from which to draw an inference of discrimination by Beneficial in its employment of Walsh at a higher salary and position. Beneficial has established a legitimate, nondiscriminatory reason for its decisions regarding Miller's status and pay.

### c. *Pretext*

■ To establish a showing of pretext, Miller offers statistical evidence, allegedly discriminatory comments made to her by her superiors and comments by her peers regarding her performance. Miller claims during the time period she was employed at Beneficial, statistics reveal that Beneficial had a policy of not promoting employees over the age of fifty and of not promoting women. Miller claims that out of the twenty employees promoted to Vice President from 1982 to 1985 only two were women and only four were over fifty years of age. Miller's 12G Statement, ¶¶ 79–80. During the period beginning 1986 and ending 1989 out of the eighteen employees hired only

four were women and the average age of those employees promoted was 39.8, with only one man over the age of fifty. *Id.,* ¶¶ 76–78.

■ Although the use of statistical evidence has been approved in employment discrimination cases, the " 'usefulness depends on all of the surrounding facts and circumstances.' " *Healy,* 860 F.2d at 1217–18 (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 1977)); *see also Churchill,* 759 F.Supp. at 1098. When using statistics, courts must consider special qualifications required to fill professional positions, the availability of qualified class members for particular professional positions and a comparison of the pool from which the employees are hired. *Valentino v. United States Postal Serv.,* 674 F.2d 56, 61 (D.C.Cir.1982) (citing *Hazelwood School Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977); *Wilkins v. University of Houston,* 654 F.2d 388, 408–10 (5th Cir.1981)); *Miller v. Aluminum* 679 F.Supp. at 499.

In this case, Miller has not provided the surrounding facts and circumstances to give meaning to the statistics she has presented. Miller has neither included the female pool of employees eligible for a promotion to Vice President nor has she provided the number of employees over the age of fifty eligible for a promotion to Vice President. Miller's proffered statistical evidence is not sufficient to infer that similarly situated and similarly available men and women and employees over fifty and under fifty have been treated differently. Miller has not established an inference of pretext based on her introduction of statistical evidence.

Miller also seeks to show Beneficial's nondiscriminatory purpose is a pretext through various comments made to her by her superiors. Miller claims that on several occasions Ward and Caspersen referred to her as "the bag lady." Miller Aff., ¶¶ 28–30. In *Perry,* the plaintiff sought to show an intent to discriminate by introducing evidence that the defendant had made

reference to the need for "new blood" in the company. 738 F.Supp. at 853 n. 5. The *Perry* court noted that "offhand comments of a joking nature are rarely considered to create sufficient doubt so as to raise an inference of intentional discrimination...." *Id.; see also Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989); *Mantione v. Ted Bates Advertising/New York*, 38 Fair Empl.Prac. Cas. (BNA) 1457, 1462, 1985 WL 2516 (S.D.N.Y.1985) (reference to employee as Santa in comment regarding retirement insufficient to warrant finding of intent to discriminate); *but see Berndt v. Kaiser Aluminum and Chem. Sales, Inc.*, 789 F.2d 253, 259 (3d Cir.1986) (reference to plaintiff as "old fashioned"); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1397 (3d Cir.) (statement that company was anxious to get younger and more aggressive employees in field was evidence of pretext when considered with other evidence that indicated defendant never investigated performance which was proffered reason for plaintiff's discharge), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

*Berndt* and *Duffy* can be distinguished from the facts in this case. In *Berndt*, the reference to plaintiff as "old fashioned" was one of several credible determining factors. 789 F.2d at 259. In *Duffy*, the age related statement was given significance because of other presented contradictions in defendant's explanation. 738 F.2d at 1397. In this case, Miller has not presented a similar accumulation of facts to show Beneficial's reasons were a pretext.

Moreover, the initial reference to Miller as "the bag lady" was made in the context of Miller collecting money for political contributions. "Bagman" is a term of art used for a person who collects money. *See* Webster's Third New Int'l Dictionary. "Baglady," said in the context of collecting political contributions, appears to be a gender specific reference to the catch word bagman.

Miller also points to Ward's remark to her that he wanted a younger person to replace him when he retired. Opp. Brief, 48. Assuming Ward indeed made this statement to Miller, Ward's statement is, nonetheless, insufficient evidence to support a finding of pretext. Ward was Senior Vice President, a promotion of Miller to Vice President would not necessarily mean she would be the only candidate to replace Ward. Indeed, at the time Ward made the statement, Miller was sixty years of age and Ward was forty-eight years of age. 2d Ward Aff., ¶ 5.

Regardless of whether Miller was promoted to Vice President, Ward's interest to have a younger replacement for his position would not be resolved. Ward was not planning on retiring until after Miller would have retired. 2d Ward Aff., ¶ 5. Therefore, the fact that Miller was not promoted has little connection to Ward's expression that he would be looking for a young replacement for Senior Vice President. *See e.g., La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412 (7th Cir.1984).

Another remark Miller relies on to show pretext on the part of Beneficial is Ward's remark that Miller should sue for discrimination. Opp. Brief, 48. Ward denies having made the remark to Miller. For purposes of summary judgment, the facts are construed in favor of the nonmoving party. The statement, however, does not refute Beneficial's nondiscriminatory purpose for not promoting Miller. Ward was her supervisor, but after he reviewed her work and submitted her name for promotion, he was not the determining voice in the consideration to promote Miller. Indeed, Miller was aware that the decision had to come from the executive committee, Caspersen and Farris. Miller Aff., ¶¶ 42, 44. In light of the legitimate grounds presented by Beneficial as reasons for not promoting Miller, Ward's statement is too attenuated and removed from the decision to present a genuine issue of material fact. *See e.g., Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir.1987).[33]

**33.** Miller also offers Ward's remark that he did not want her carrying home drunks as evidence

Miller also seeks to show pretext by a memorandum, dated 14 March 1984, from Ward to Farris recommending Miller for the promotion to Government Relations. Opp. Brief, 49; Schwartz Certif., Ex. 1. Miller *characterizes* the memorandum as saying Beneficial was "bringing plaintiff into the department at $10,000.00 to $20,-000.00 below *market* replacement." Opp. Brief, 49 (emphasis in original text). Miller has, however, incorrectly paraphrased the memorandum. The memorandum states: "I have reviewed about 100 resumes and I believe that to *find* an outside replacement of equivalent background and experience would cost at least $10,000 more and probably double that." Schwartz Certif., Ex. 1 (emphasis added). Ward's focus in the memorandum is on costs incumbent with *finding* a replacement, not costs incurred with *employing* a replacement. Miller's subjective interpretation of the memorandum is insufficient to establish a pretext of discrimination.

 Lastly, Miller provides letters and memoranda she received throughout her employment in Government Relations to show she had good working relations with people within and outside Beneficial. Miller Aff., Exs., 5, 8–10, 16, 24–27, 32–33; Schwartz Exs., 28–29. Miller argues, therefore, Beneficial's explanation that Miller was not qualified because of her "interpersonal skills" is a pretext. These letters and memoranda, however, are written by colleagues and clients of Government Relations. The letters and memoranda were not written by persons in a position to assess Miller's performance according to Beneficial's management objectives. *See e.g., Colgan,* 935 F.2d at 1422–23.

A court is not in a position to second-guess business decisions made by employers. *Billet,* 940 F.2d at 828. In this case, Beneficial has articulated legitimate, non-discriminatory business reasons for not promoting Miller and paying Miller the

equivalent salary of Walsh. The evidence proffered by Miller is insufficient to establish a genuine issue of material fact that Beneficial's legitimate, nondiscriminatory explanation is merely a pretext. Summary judgment is granted with respect to Counts Two, Three, Four and Six.

### E. Cross–Motion

Miller appeals the Orders of Magistrate Judge Hedges, filed 2 July 1990, 31 October 1990 and 7 March 1991. Pl's Ltr. Brief. Pursuant to 28 U.S.C. § 636(b)(1), Rule 72 of the Federal Rules of Civil Procedure and Rule 40(A) of the General Rules of the United States District Court for the District of New Jersey, a United States Magistrate Judge may hear "dispositive" and "nondispositive" motions assigned by the district court. Section 636(b)(1) states a district court may "accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." 28 U.S.C. § 636(b)(1).

 With regard to nondispositive motions, the district court may modify the magistrate's order only if the district court finds that the magistrate's ruling was "clearly erroneous or contrary to law." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1113 (3d Cir.1986, *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). To appeal a magistrate's order, however, the party must file a written notice of appeal within ten days after entry of the Magistrate Judge's order. N.J.Fed. Prac.R. 40 D 4(a).

Miller's cross-motion was untimely filed. The latest order from which Miller appeals was entered on 7 March 1991. Miller did not file the cross-motion to appeal until 7 August 1991—five months after Magistrate Judge Hedges issued the order. Mil-

of age discrimination. Miller Aff., ¶ 43; Opp. Brief, 48. Miller's contention is without merit. Ward does not deny making the statement. The statement, however, was made in the context of Miller's request to be reassigned as a Government Relations Director. Whether Beneficial thought Miller was ill suited for the position of a Government Relations Director has no relevance nor can it be the basis of an inference that Beneficial did not promote Miller to Vice President because of age or gender.

ler's cross-motion to compel discovery is denied.

*Conclusion*

For the foregoing reasons, summary judgment is granted and the complaint is dismissed in its entirety with prejudice under Fed.R.Civ.P. 56. Miller's cross-motion to compel discovery is denied pursuant to N.J.Fed.Prac.R. 40 D 4(a) as untimely, and now moot.